IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

TONY LAMAR MAYE,                  )
                                 )
        Plaintiff,               )
                                 )
vs.                              )   CIVIL ACTION NO. 04-00781-BH-B
                                 )
JO ANNE B. BARNHART,             )
Commissioner of                  )
Social Security,                 )
                                 )
        Defendant.               )

## REPORT AND RECOMMENDATION

Plaintiff Tony Lamar Maye ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner denying his claim for disability insurance and supplemental security income benefits under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433 and 1381-1383(c). This action was referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Oral argument was held on October 31, 2005. Upon careful consideration of the record, the undersigned respectfully recommends that the decision of the Commissioner be **AFFIRMED.**

## I.  Procedural History

During April and May, 1998, Plaintiff protectively filed applications for supplemental security income benefits and disability insurance benefits, alleging that he has been disabled since December 31, 1997 due to hip, groin and lower back pain.

(Tr. 106-109, 166-169, 218, 554-558).  Plaintiff's initial applications were denied and he filed a Request for Hearing before an Administrative Law Judge ("ALJ").  (Id. at 106-112, 138-143, 559-568).  ALJ Glay E. Maggard ("ALJ Maggard") conducted a hearing on March 16, 1999, which was attended by Plaintiff, his representative, a witness on his behalf, and James Cowart, a vocational expert.  (Id. at 42-70).  On August 12, 1999, ALJ Maggard entered a decision wherein he found that Plaintiff is not disabled as he can perform his past relevant work ("PRW").[1]  (Id. at 113-125).  The Appeals Council ("AC") reviewed the 1999 decision and on May 11, 2001, remanded the case for further administrative proceedings.  (Id. at 155-158).

A supplemental hearing was conducted by ALJ Maggard on January 3, 2002, and was attended by Plaintiff, her representative and Barry Murphy, a vocational expert.  (Id. at 71-105).  On March 20, 2002, ALJ Maggard issued an unfavorable decision finding that Plaintiff retained the residual functional capacity ("RFC") to perform light work activity not entailing more than occasional bending, squatting, crawling or climbing; and not requiring lifting more than 25 pounds frequently, carrying more than 20 pounds frequently, or sitting, standing or walking more than 1 hour each

---

[1]The ALJ also completed a psychiatric review technique form finding that while Plaintiff's mental impairment included the presence of an affective disorder and a history of depression, he did not meet Listing 12.04; and that he has slight restriction of daily activities and maintaining social functioning, but no other deficiencies or limitations.  (Id. at 126-128).

at one time, working in unprotected heights and/or concentrated exposure to moving machinery or driving an automobile. (Tr. 20-31). The AC denied Plaintiff's request for review of the ALJ's decision, making it the final decision of the Commissioner. (Id. at 10-12). 20 C.F.R. §§ 404.981, 416.1481. The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. § 405(g).

## II.  **Background Facts**

Plaintiff was born on December 2, 1971 and was 30 years old at the time of the administrative hearing. (Tr. 166, 554). Plaintiff has an 11th grade education and PRW as a laborer, substitute bus driver, janitor and security guard. (Id. at 47, 67, 224, 233). Plaintiff last worked in January 1998 as a security guard. (Id. at 47). According to Plaintiff, he was laid off from this job due to cutbacks. (Id. at 53). Plaintiff received unemployment benefits for 6 months thereafter, and in doing so, certified that he was able to work up until July 1998. (Id. at 52-53, 56).

At the March 16, 1999 hearing, Plaintiff testified that he has problems with his pelvic bone/groin area due to a 1990 football injury, and that over time, it has gotten worse. (Id. at 47-51, 53). He testified that nothing happened to worsen the condition, but that his bone "each year [] seemed to get bigger and longer and longer." (Tr. 54). According to Plaintiff, in February/March 1998, he saw Dr. Charles Roth for his condition, and in April 1998,

he sought treatment from the Stanton Road Clinic.  (<u>Id</u>. at 55-56).
Plaintiff also sought treatment at USA Orthopedic for this
condition, and following x-rays and CAT scans, in November 1998,
they removed a long piece of calcium on the bone which was pressing
on his nerves and causing pain.  (<u>Id</u>. at 48-49).  Plaintiff
testified that since surgery, he has had the same pain and is
constantly taking pain medicine and sleeping pills.  (<u>Id</u>. at 49).
Plaintiff also indicated that he was still receiving treatment at
USA Orthopedic with physical therapy 3 times per week, to loosen
his muscles and strengthen his legs.  (<u>Id</u>. at 49-50).  Plaintiff
opined that the surgery made his condition worse temporarily, but
his doctors hope that they have given him enough radiation
treatment so that the bone formation will not return.  (<u>Id</u>. at 58).
Plaintiff does not believe that the physical therapy is helping
because he has problems bending his legs (cannot put on
socks/shoes), his legs become stiff, and he has difficulty walking
up steps.  (Tr. 50).  According to Plaintiff, he walks with a
stick/cane, and his father built slanted steps on Plaintiff's house
to assist him with his mobility.  (<u>Id.</u>)

Plaintiff testified that he can walk maybe 100-200 yards
without having to stop, but at that point, his legs become numb,
his thigh becomes tingly, and he needs to sit for about 5-10
minutes due to the pain.  (<u>Id</u>. at 51).  Plaintiff indicated that he
initially took Ibuprofen for his pain, but that in November 1998 he

started taking Lortab, and that by February 1999 he was taking Talwin, for relief of the pain. (Id. at 56). Plaintiff testified that he has not received treatment for any other physical conditions and does not have any other physical ailments that create problems with his walking or standing. (Id. at 52). Plaintiff did indicate, however, that he has received treatment from the Mobile Mental Health Center ("MMHC") for anxiety and depression. (Id. at 52-53). According to Plaintiff, his last visit was in June 1998, and he ceased treatment at MMHC because they were pressuring him to participate in group therapy and he did not wish to do so. (Tr. 52-53).

Regarding his daily activities, Plaintiff testified that he has a driver's license and drives some, that he can put on his pants/shirt but cannot put on his socks or tie his shoes, and that he is able to do some cooking, but does not clean his house. (Id. at 51-52, 57-58).

Ida Barnes ("Barnes"), Plaintiff's grandmother-in-law and next door neighbor, testified that he lives less than 100 feet from her, and that she sees him at least 3 times a day for meals, except when he goes to Mobile. (Id. at 59-62). Barnes testified that Plaintiff has problems coming up and down the trailer steps, that he walks with a stiff limp in one leg, and that he has to constantly move. (Id.) She also indicated that she does not believe that the surgery eliminated Plaintiff's pain, and that she

provided him with the money for his pain medication until she could no longer afford to do so. (Id. at 62-65).

At the January 3, 2002 supplemental hearing, Plaintiff testified that since March 1999, he has not been able to engage in any employment, his living arrangements have remained the same and he has had no income. (Id. at 77). He continues to have problems with hip pain and it hurts for him to walk for long periods of time. (Tr. 77-78). Plaintiff testified that he was receiving treatment from USA but no longer does so because they told him that they could not cut all of the bone formation out and could no longer treat him until he obtained Medicaid or insurance. (Id. at 78). Accordingly, he sought treatment from Dr. Aquilino, and had been seeing him, on and off, for approximately 1½ years for high blood pressure and pain in his hips. (Id. at 79). Plaintiff also received treatment from Dr. Chowdherry, for about 1 year, for hip pain and high blood pressure. (Id. at 80). According to Plaintiff, Dr. Chowdherry referred Plaintiff him to Dr. Wallace, an orthopedist, who told him that he has a large amount of scar tissue and bone formation on his hip, and that Plaintiff needed surgery.[2] (Id. at 80, 89-90). Plaintiff also saw Dr. Barnes after he encountered problems urinating. (Id. at 81-82). According to Plaintiff, a sugar level test for diabetes was performed and

---

[2]According to Plaintiff, Dr. Wallace indicated that he needed an MRI; however, he could not afford one.

6

revealed a large amount of sugar spilling in his urine; thus, he was placed on medication for same. (Tr. 81-82).

Plaintiff also indicated that he has sought treatment in the Monroe County Hospital emergency room for his pain, and has been provided prescription pain pills (Ultram and Lortab) that help "so, so." (Id. at 82-83). He has also been prescribed Celebrex, which he discontinued due to bleeding, Zoloft, and Norvasc for high blood pressure. (Id. at 83). Plaintiff testified that his hip pain causes the following limitations: he cannot bend, has to sit on his left side, has to sleep on his left side, has to step with his left leg first, constantly feels pain in his groin area upon walking, can only walk about 50-60 yards without feeling pain and can only sit for about 15 minutes without having to get up as his legs go numb. (Id. at 83-84). According to Plaintiff, he takes 2-3 hot baths daily and uses crutches/cane when he goes out to help relieve his pain. (Id. at 84). He testified that he can lift/carry about 40 pounds, has no problems using his feet, has trouble bending when it involves his hip and takes Ultram and Lortab for pain. (Id. at 92-93). Moreover, Plaintiff testified that in addition to his physical impairments, his depression keeps him down all the time so he does not feel like doing anything and cannot play with his child. (Tr. 85). He also has trouble sleeping and has a lot of nights where he does not sleep at all, maybe 1-3 times per week. (Id. at 85-86).

Regarding his daily activities, Plaintiff indicated that he spends his day trying to read books/newspapers, watching television, laying down and walking off and on trying to stay loose. (Id. at 85). Plaintiff is able to cook a light meal and wash a few dishes, but cannot do laundry as bending causes pain. (Id. at 87). Plaintiff also indicated that he does not take his son to school because that would be "rough;" however, he wakes him up and makes sure that he is dressed properly and has his books packed. (Id. at 88-89).

## III. Issues On Appeal[3]

A.   Whether the ALJ erred by failing to assign controlling weight
     to the opinion of Plaintiff's treating physician?

B.   Whether the ALJ erred by finding that Plaintiff could perform
     his PRW as a security guard when VE testimony limited him to
     the performance of a sit/stand option job?

C.   Whether the ALJ erred by failing to develop a full and fair
     record regarding the vocational opportunities available to
     Plaintiff in violation of SSR 00-4p?

## IV. Analysis

### A.   Standard of Review

In reviewing claims brought under the Act, this Court's role is a limited one. This Court's review is limited to determining: 1) whether the decision of the Secretary is supported by substantial

---

[3]In addressing Plaintiff's appeal, the undersigned notes that Plaintiff has not presented any issue with regard to any alleged mental impairment. Accordingly, while the undersigned has reviewed the entire record, reference to Plaintiff's mental health records will not be discussed herein, unless they also include reference to Plaintiff's physical complaints. Additionally, Plaintiff has admitted that his mental impairment is not the reason he is unable to work. (Id. at 201).

evidence; and 2) whether the correct legal standards were applied. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[4] A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (stating that substantial evidence is defined as "more than a scintilla, but less than a preponderance[,]" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]").  In determining whether substantial evidence exists, courts must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

**B.**  **Discussion**

An individual who applies for Social Security disability benefits or supplemental security income must prove their disability.  20 C.F.R. §§ 404.1512, 416.912.  Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

---

[4]This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven his or her disability.[5] 20 C.F.R. §§ 404.1520, 416.920.

In the case <u>sub judice</u>, substantial evidence supports the ALJ's decision. The evidence reflects that Plaintiff was treated by Richard McGrew, M.D. ("Dr. McGrew") in March 1998 for pain in his right leg. (Tr. 276-284, 321). Plaintiff reported that he initially injured his right leg in 1990 while playing football, and that now he had a bone sticking out and causing his pain in his right groin area. (<u>Id.</u>) An x-ray revealed an old fracture of the right public ramus, with a nonunion and a questionable large

---

[5]First, Plaintiff must prove that he has not engaged in substantial gainful activity. Second, Plaintiff must prove that he has a severe impairment or combination of impairments. Third, if Plaintiff proves that the impairment or combination of impairments meets or equals a listed impairment, then he is automatically found disabled regardless of age, education, or work experience. If the Plaintiff cannot prevail at the third step, he must proceed to the fourth step where he must prove an inability to perform his past relevant work. <u>Jones v. Bowen</u>, 810 F.2d 1001, 1005 (11th Cir. 1986); <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991) (per curiam). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: 1) objective medical facts and clinical findings; 2) diagnoses of examining physicians; 3) evidence of pain; 4) the claimant's age, education and work history. <u>Jones</u>, 810 F.2d at 1005. Once Plaintiff meets this burden, the burden shifts to the Commissioner to prove at this fifth step that Plaintiff is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given his residual functional capacity, age, education, and work history. <u>Wolfe v. Chater</u>, 86 F.3d 1072, 1077 (11th Cir. 1996). <u>See generally</u> <u>Sryock v. Heckler</u>, 764 F.2d 834 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs that the Plaintiff can perform, the burden shifts back to the Plaintiff who must prove an inability to perform those jobs, in order to be found disabled. <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999); <u>Allen v. Sullivan</u>, 880 F.2d 1200, 1201 (11th Cir. 1989); <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing <u>Francis v. Heckler</u>, 749 F.2d 1562, 1564 (11th Cir. 1985)).

osteochondroma projecting down almost to the skin surface.  (<u>Id</u>. at 278).  Dr. McGrew diagnosed "[o]ld right fracture right pubic ring with questionable large osteochondroma" and referred Plaintiff for an orthopaedic evaluation.  (<u>Id</u>. at 278-279).  On March 10, 1998, Plaintiff underwent an orthopaedic evaluation performed by orthopaedic specialist Charles A. Roth, M.D. ("Dr. Roth").  (<u>Id</u>. at 317-318).  Dr. Roth's examination revealed painless motion of the hip, with extreme adduction, and a little tenderness over the proximal adductor origin.  (<u>Id</u>. at 318).  Dr. Roth noted Plaintiff was "very well muscled," and that his neurological exam was intact in the lower extremities.  (Tr. 318).  A CT scan of the pelvis showed an apparent "myositis ossificans" involving the "right proximal adductor brevis muscle[,]" consistent with an old avulsion fracture; no acute fracture was noted.  (<u>Id</u>. at 318, 320).  On April 17, 1998, Tim Revels, M.D. ("Dr. Revels") opined that Plaintiff was disabled and unable to perform sedentary jobs, due to pain, and was in urgent need of excision of the "mass" so he could become gainfully employed.  (<u>Id</u>. at 306).

On September 12, 1998, Plaintiff was seen at USA for evaluation of pelvic mass.  (<u>Id</u>. at 329).  On October 27, 1998, Plaintiff was seen at USA for chronic progressive pain, an inability to work, intercourse leading to pain, right testicle removal and medications. (<u>Id</u>. at 327, 376-377).  Roentgenological findings revealed thickening and irregularly of right pubic and ischial rami-slight

deformity in pelvis.  (Id. at 377).  On November 4, 1998, Plaintiff had his right groin heterotopic bone removed at USA by Mark Donald Perry, M.D. ("Dr. Perry").  (Tr. 340-356).  Upon discharge, he was in good condition, had independent locomotion and was given a good prognosis.  (Id.)  Dr. Perry noted that Plaintiff reported that the mass inhibited him from walking long distances, participating in physical activities and caused problems with sexual intercourse. (Id. at 345).  On January 13, 1999, Plaintiff presented to Dr. Perry at USA for a postoperative follow-up.  (Id. at 375).  Dr. Perry's notes reflect that no keloid formed, but that he does have a firm ridge in the adductor muscle; he was given pain and sleep medicine and told to follow-up.  (Id. at 375).

On February 8, 1999, Plaintiff was evaluated by Andre Fontana, M.D. ("Dr. Fontana") at the State Agency's request.  (Id. at 357-358).  Plaintiff reported that he could live with the pain until last year when he could no longer stand it, had surgical intervention in 1998, physical therapy in 1990, and now his right hip pain radiates down his entire right side.  (Tr. 357).  He added that he has fallen on several occasions, has a painful range of hip motion and complains of right arm pain to his fingers and right hand with tingling, muscle weakness and decreased grip strength.  (Id.) He also complained of painful range of motion with his right shoulder and reported that his entire left side wakes him up at night and that he takes Ambien for relief.  (Id.)  Plaintiff also

reported ambulating without assistance up to 100 yards, cooking and driving occasionally. (Id.) His exam revealed 2+ deep tendon reflexes except at biceps, triceps and brachial radials, normal sensory and motor function, a minimally slightly weaker grip strength on the right, good squatting, good toe/heel gait, straight leg raising test 90 degrees sitting and 45 degrees on the right and left in the supine position, mild hip pain, good range of motion of the hip, range of motion of cervical spine is flexion 55, extension 30, lateral rotation 45 to right and 40 to left, flexion 25 to right and 25 to left. (Id.) Dr. Fontana noted that Plaintiff was still convalescing from surgery and while it is possible that he will improve in future, at that time, he was limited to sedentary and light activities (pelvis still healing). (Id. at 358).

Additionally, Dr. Fontana completed a physical capacities evaluation in which he concluded that Plaintiff could sit/walk/stand for 1 hour each at a time; sit for a total of 8 hours per 8 hour day; stand for a total of 6 hours per 8 hour day; walk for a total of 4 hours per 8 hour day; lift up to 10 pounds continuously; lift up to 25 pounds frequently; lift up to 50 pounds occasionally; and never lift 51 pounds of more. (Tr. 359). He also found that Plaintiff can carry up to 5 pounds continuously, 20 pounds frequently, 25 pounds occasionally, and never 26 pounds or more. (Id.) Plaintiff can use his right/left hands for simple grasping, pushing/pulling and fine manipulation; and both his feet for

13

repetitive movements.  (Id.)  Dr. Fontana concluded that Plaintiff
could occasionally bend, squat, crawl, climb; frequently reach; had
mild restrictions driving automotive equipment; total restrictions
with unprotected heights; and moderate restrictions against being
around moving machinery.  (Id.)  He found Plaintiff limited to light
and sedentary work.  (Id.)

Treatment notes from Dr. Perry reflect that on February 10,
1999, Plaintiff reported that he was doing well in therapy, but
experienced pain once he got home.  (Id. at 374).  Plaintiff was
directed to continue in therapy.  (Tr. 374).  On February 24, 1999,
Plaintiff reported to Dr. Perry that he felt "very good" while in
physical therapy or while in a hot bathtub, and experienced
improvement for up to 1 hour after treatment; however, he would
stiffen up later.  (Id. at 373).  Thus, he did not feel that he was
making any improvement.  (Id.)  Dr. Perry noted that the fact that
Plaintiff loosen up for an hour indicated improvement and he
directed him to continue physical therapy.  (Id.)  On March 11,
1999, Dr. Perry, in a written communication to Plaintiff's counsel,
opined that Plaintiff's pre-operative condition did not involve
nerves or blood vessels, that his prognosis should involve
considerable relief of discomfort and that his ability to engage in
substantial gainful employment was dependent on his progress in
physical therapy.  (Id. at 379).  According to Dr. Perry, the
prognosis of Plaintiff's bone should be "considerable relief of

14

discomfort" as his physical therapy is providing good relief of symptoms for up to 3 hours. (Id.) A status report from physical therapy dated March 17, 1999 indicated that Plaintiff had decreased pain and greater flexibility immediately following treatment, but reported that he experienced only temporary relief. (Tr. 390). The treatment notes also showed improvement of hip flexibility from 70-85 degrees and hip adduction from 30-35 degrees, and that due to the travel distance for appointments, Plaintiff was instructed to do his stretches and strengthening exercises at home. (Id.)

Treatment notes from George Russell, M.D. ("Dr. Russell") reflect that on March 18, 1999, Plaintiff reported to him that he is doing somewhat better but does still complain of pain in his right hip. (Id. at 389). Physical therapy was discontinued and Plaintiff was directed to continue with strengthening exercises and was given Ambien to help him sleep. (Id.) On April 20, 1999, Dr. Perry noted that the radiographs showed no recurrence of Plaintiff's bone mass even though he reported episodic scrotal numbness present but intermittent, that he is worse in the morning but feels very good with warm shower or hot bath, and that he has pain with adduction whether his hip is extended or flexed (about 20-25 degrees), but is nonpainful around his well-healed scar. (Id. at 388). He was assessed with fibrosis that is "improving" after surgery and was placed on Naprosyn and given Lodine samples. (Id.) On May 25, 1999, Dr. Russell saw Plaintiff for complaints of some

pain with some dyspareunia – 10/10 at worst, but now 7/10; he reports that he is able to perform but still has significant pain/discomfort and was placed on Flexeril and Lortab. (Tr. 386). On June 13, 1999, Plaintiff was seen by Dr. Russell for a follow up; he was doing "fairly well" but still complained of some right hip pain. (Id. at 385). He reported that he had recently tried to work as a dispatcher with the Sheriff's department but did not like the job and thus quit. (Id.) His physical exam was unchanged, so he was instructed to continue activities as tolerated and return on an as needed basis. (Id.)

On September 2, 1999, Plaintiff reported to Dr. Perry that he had "popping" all the time and hurt. (Id.) Plaintiff was seen by Dr. Perry at USA for follow-up on January 11, 2000, and complained of right groin pain. (Id. at 382, 384, 526). Dr. Perry's treatment notes reflect that Plaintiff was able to ambulate with some pain, and reported that he was unable to exercise his lower body due to pain; however, he had not been doing stretching exercises at home. (Tr. 382, 384, 526). The physical exam revealed minimally tenderness to palpation over medial groin on right, a wound completely healed, range of motion limited by stiffness; and his x-rays show no recurrence of heterotopic ossification and a small residual amount of it was noted in the obturator foramen. (Id.) Impression was thigh pain, status post section of heterotopic ossification, potentially related to impingement on the obturator

16

nerve but unlikely.  (Id.)   It was further noted that Plaintiff would be sent for an MRI when Medicaid came through.  (Id.) Plaintiff, however, did not keep his February appointment.  (Id.)

From February 2000-January 15, 2002, Plaintiff was treated by Stanley Barnes, M.D. ("Dr. Barnes").  (Id. at 391-392, 410, 549-553).  Dr. Barnes' treatment notes of February 15, 2000 reflect that Plaintiff was examined for right hip pain in the groin area.  (Tr. 391-392, 410, 549-553).   There were no clinical findings, and Plaintiff was continued on his medications.  (Id.)  On April 11, 2000, Dr. Barnes completed a physical capacities evaluation form wherein he concluded that Plaintiff could sit/stand/walk 2 hours at one time, and could sit/stand/walk for a total of 2 hours in an 8 hour day; could occasionally lift/carry up to 10 pounds but never more; could not use his right/left hands for simple grasping, pushing, pulling or fine manipulation; could not use his feet for repetitive action; could occasionally bend, squat, crawl, climb and reach; and has moderate restrictions of activities relating to unprotected heights, exposure to marked changes in temperature and humidity, driving automotive equipment, exposure to dust, fumes or gases.  (Id. at 391).

Dr. Barnes' May 3, 2000 treatment notes reflect that Plaintiff's blood pressure was elevated and his extremities showed showed arthralgias, myalgias and evidence of arthritis in the right shoulder and hip.  (Id. at 410).   He was diagnosed with

osteoarthritis in right hip and hypertension and started on Ziac for his blood pressure. (Id.) The notes for June 28, 2000 reflect that Plaintiff's blood pressure had improved, and that he complained of abdominal pain and dark stools. (Id.) He was diagnosed with abdominal pain and heme positive stools, and was given sample of Axid, Ziac and Sonata. (Tr. 410). In December 2001, Dr. Barnes' notes reflect that Plaintiff had not been in for treatment in over 1 year, and that he reported problems with urination, bloody stool and pain in his groin. (Id. at 550). Dr. Barnes noted that Plaintiff's prostate was enlarged but not nodular, and diagnosed him with possible benign prostrate hypertrophy, new onset diabetes and rectal irradiation. (Id.) Dr. Barnes also noted that Plaintiff and his family are overweight, and he gave him Cutivate for use in the rectal area, Flomax and Prandin. (Id.)

From January 2001-April 2004, Plaintiff was seen by K. Aquilino, M.D. ("Dr. Aquilino") and Tri-County Uriah, on various occasions for his diabetes, hypertension, shoulder and back pain, and prostatitis. (Id. at 588-595, 650-672). Examinations were unremarkable. (Id.) Plaintiff's blood pressure was not elevated and Dr. Aquilino opined that he did not have diabetes. (Tr. 588-595, 656-670). Plaintiff was treated with Ultram and reported he got some relief during the day from the pain. (Id.) During this treatment, Plaintiff was given a number of medications including Lortab, Ultram, Ziac, Cephalexin and Lincocin. (Id.)

Mobile Infirmary Association records from March 28, 2001 and May 18, 2001 reveal that Plaintiff presented to the ER for chronic right hip/back pain and a recent infection of his prostrate with claims of increased pain with ambulating and weight bearing movement. (Id. at 527-546). He reported he was taking Celebrex, Ziac, Levaquin, Lortab, Ultram and Darvocet (and "stomach medication"), had no difficulty walking, had full range of movement in his extremities and had no pedal edema. (Id.) An x-ray performed on Plaintiff's hip on March 28, 2001 was within normal limits and showed no degenerative changes in the hip joint; however, a notation was made of an old healed fracture of the right inferior pubic ramus. (Id. at 534). Plaintiff was prescribed Venoporol, Ultram, Zoloft and Hydrocodone. (Tr. 527-546). On May 18th, it was noted that Plaintiff claimed that he was supposed to use crutches, but he did not bring them. (Id. at 541, 545). He was assessed in good condition upon discharge and was ambulatory. (Id.) Plaintiff reported he had last taken pain medication 2 weeks before and that he had not taken his hypertension medication in 2 days. (Id.)

On October 29, 2001, William A. Crotwell, III, M.D. ("Dr. Crotwell") conducted an orthopaedic evaluation of Plaintiff at the request of the State Agency. (Id. at 465-466). Plaintiff complained of right hip pain, pain radiating to right leg, and of being unable to walk without crutches. (Id.) Dr. Crotwell's examination of Plaintiff revealed normal toe/heel walk; 2+ reflexes;

19

normal sensory exam; 5/5 motor strength; 50% flexion and 40% extension without tenderness/spasms; sitting straight leg raising test at 90 degrees with no pain at all; negative bilateral lying hip rotation. (Tr. 466). Dr. Crotwell noted that: with lying straight leg raising test on the left, Plaintiff had increased pain with plantar flexion at 90 degrees and decreased pain with dorsiflexion and the pain was on the contralateral side; with right straight leg raising test, he would fight the doctor by holding his leg with his own muscles and when the leg was released he had increased pain at 80 degrees with plantar flexion and no change with dorsiflexion which Dr. Crotwell opined was inconsistent. (Id.) He also noted that Plaintiff's calves were 16 inches and his thighs were "tremendous quad and musculature" with right thigh measuring 3/8 inches larger than the left which Dr. Crotwell opined was "very inconsistent[;]" x-rays of lumbar spine showed some very minimal arthritis and x-ray of his hips was totally negative with respect to arthritis. (Id.) Dr. Crotwell concluded that Plaintiff had very little orthopaedic problems, was very muscular, had extremely large quads for a person on crutches and found it very difficult to believe he was on any crutches at all. (Id.) He opined that Plaintiff could carry out moderate, light and sedentary work. (Id.) Plaintiff was diagnosed with spur of right superior rami and "very little orthopaedic problems." (Id.)

Dr. Crotwell also completed a physical capacities evaluation

on this date, in which he found Plaintiff could sit/stand/walk for a total of 2 hours at one time; sit/stand/walk for a total of 8 hours in an 8 hour workday; lift up to 50 pounds frequently, 25 pounds continuously and up to 100 pounds occasionally; carry up to 25 pounds frequently, 20 pounds continuously and up to 50 pounds occasionally but never 51 pounds or more; frequently bend, squat, crawl, climb and reach continuously; use both hands for simple grasping, pushing and pulling and fine manipulation; use feet for repetitive movements; had moderate restrictions with unprotected heights, mild restriction being around moving machinery and driving automotive equipment and no other restrictions; and could perform "moderate, light and sedentary work."  (Tr. 467).

On January 7, 2002, examining physician Milton A. Wallace, Jr., M.D. ("Dr. Wallace") indicated in a letter to Plaintiff's counsel, that x-rays after his surgery showed excellent results, that there was no evidence of recurrent heterotopic bone and that following surgery, his range of motion was "quite good."  (Id. at 547-548). Dr. Wallace also noted that the MRIs of Plaintiff's hips, pelvis and lumbar spine were completely normal and that accordingly, there was no objective or obvious reason for "persistent pain as he describes[]" to keep him from returning to gainful employment. (Id.)  On May 21, 2002, Plaintiff told Dr. Aquilino that he hurt his left shoulder when he fell from a 4 wheeler the week before; his exam showed no sensory/motor deficits and x-rays showed no evidence

of fractures/dislocations and he was prescribed Ibuprofen for pain. (Id. at 658).

1.   **Whether the ALJ erred by failing to assign controlling weight to the opinion of Plaintiff's treating physician?**

Plaintiff contends that the ALJ erred by failing to properly assign controlling weight to the opinion of his treating physician, Dr. Barnes, particularly the opinions expressed in the physical capacities evaluation completed by him and in his treatment notes, in violation of SSR 96-2p and 20 C.F.R. § 404.1527(d).  (Doc. 8 at 4-6).  Plaintiff argues that the ALJ failed to give any weight to Dr. Barnes' RFC finding of less than sedentary and to the complaints of hip/groin pain from which he assessed myalgias, arthralgias and pain to palpation in the lower back.  (Id. at 5-6 (citing Tr. 391-392)).  Plaintiff claims that Dr. Barnes' findings are supported by: 1) Dr. Revels' April 7, 1998 note which stated that Plaintiff could not perform any job, even one sitting, due to pain, and that he needed a mass excised to allow him to become gainfully employed; and 2) Dr. Perry's treatment notes (Id. (citing to Tr. 305, 346, 373, 379)).

The undersigned finds that the ALJ's decision is supported by substantial evidence.  Eleventh Circuit case law provides that controlling weight must be given to the opinion, diagnosis and medical evidence of a treating physician, unless there is good cause to do otherwise.  Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159-1160 (11th Cir. 2004) (per curiam); Phillips v. Barnhart, 357

22

F.3d 1232, 1240 (11th Cir. 2004); Lewis v. Callahan, 125 F.3d 1436, 1439-1441 (11th Cir. 1997); 20 C.F.R. § 404.1527(d)(2).  "[G]ood cause exists when the (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips, 357 F.2d at 1240-1241 (citing to Lewis, 125 F.3d at 1440); Edwards v. Sullivan, 937 F.2d 580 (11th Cir. 1991) (holding that the ALJ properly discounted a treating physician's report where the physician was unsure of the accuracy of his findings and statements). Accordingly, a treating physician's disability opinion may be discredited where it is inconsistent with the physician's own clinical notes and physical capacities evaluation.  Jones v. Dep't of Health & Human Services, 941 F.2d 1529, 1533 (11th Cir. 1991). Moreover, where a treating physician has merely made conclusory statements, the weight afforded to them by the ALJ depends upon whether they are supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986) (per curiam); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).  In contrast, good cause "is not provided [simply] by the report of a nonexamining physician where it contradicts the report of the treating physician." Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988). When a treating physician's opinion does not warrant controlling

weight, the ALJ must clearly articulate his reasons, which must also be legally correct and supported by substantial evidence in the record. <u>Crawford</u>, 363 F.3d at 1159-1560; <u>Lamb</u>, 847 F.2d at 703-704.

In the case <u>sub judice</u>, the ALJ found that controlling weight should not be assigned to the opinion of Dr. Barnes and in doing so, clearly articulated his reasons for same. The ALJ noted that:

> Dr. Stanley Barnes, a family practitioner, initially examined the claimant on February 15, 2000 and diagnosed him with right hip pain. Dr. Barnes simply refilled the claimant's analgesic and anti-inflammatory medications and advised him to return as needed. The claimant next sought Dr. Barnes' attention on April 3, 2000, when Dr. Barnes noted that the claimant's extremities demonstrated myalgias and arthralgias and his lower back was tender to palpation. Once again, Dr. Barnes refilled the claimant's prescriptions and told him to return as needed. On April 11, 2000, Dr. Barnes opined that the claimant could not perform the demands of even sedentary work. The undersigned is not compelled to agree with this assessment due to the fact that **<u>Dr. Barnes provided no rationale behind his decision. Dr. Barnes' treatment notes do not reflect detailed explanations of the claimant's physical examinations in terms of range of motion, straight leg raise evaluation, strength assessment or presence of edema. Rather, Dr. Barnes simply noted his observations of the claimant's general arthralgias and refilled his medications</u>**. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, and the better an explanation a source provides for an opinion, the more weight the Social Security Administration will give that opinion (20 CFR §§ 404.1527(d)(3) and 416.927(d)(3). **<u>Dr. Barnes' functional capacity assessment is neither rationalized by a supportive narrative nor substantiated by his own treatment notes. As such, Administrative Law Judge finds that controlling weight cannot be assigned to Dr. Barnes' opinion</u>** (Exhibit 20-F).

> After Dr. Barnes penned his functional capacity assessment, he examined the claimant in May 2000 and June

> 2000, and diagnosed him with osteoarthritis of the right
> hip, hypertension, abdominal pain and heme positive
> stools.  No additional physical findings were made by Dr.
> Barnes in addition to the previously mentioned myalgias
> (Exhibit 26-F).
>
>                     * * *
>
> Dr. Barnes examined the claimant on December 27, 2001 and
> noted that the claimant had not seen him in over one
> year.  Dr. Barnes diagnosed the claimant with diabetes
> based on blood glucose analysis and referred him to a
> diabetic teaching class (Exhibit 46-F).

(Tr. 23, 25 (emphasis added)).

A review of the record reveals that the ALJ properly declined
to assign controlling weight to Dr. Barnes' opinion because it was
unsubstantiated by, and inconsistent with, reliable objective
medical evidence of record, and was conclusory.  At the outset, the
undersigned notes that Plaintiff testified that he lost his most
recent job as a security guard not due to any physical ailment, but
due to being laid off from cut backs.  (Tr. 47-48, 53).  Moreover,
while Dr. Barnes indicated in an April 11, 2000 physical capacities
evaluation that Plaintiff could not perform sedentary work, his
treatment notes for February 15th, April 3rd and May 3rd fail to
document any clinical findings to support his opinion, and his
treatment notes are devoid of a detailed explanation of his physical
examination of Plaintiff in terms of range of motion, straight leg
raising evaluation, strength assessment or the presence of edema.
(Id. at 392, 410).  Thus, it is simply unclear upon what basis Dr.
Barnes reached his own conclusions regarding Plaintiff's right hip
pain, myalgia, arthralgia and arthritic-related problems.  Indeed,

Dr. Barnes' February 15th notes reflect that Plaintiff had been on pain medication that "helped him out[,]" and his April 3rd notes reflect that his treatment has "helped him out." (Id. at 392). Also, Dr. Barnes noted that there were large gaps in the time Plaintiff came in for treatment, including a period of over 1 year when he was not even treated by Dr. Barnes at all (from September 7, 2000 to December 27, 2001). (Id. at 391-392, 410, 549-553).

Moreover, Dr. Barnes' RFC opinion was inconsistent with the findings of other treating and consultative physicians who examined Plaintiff after his surgery to remove the heterotopic bone mass and appear to be based on Plaintiff's own self-serving subjective reports. For example:

- Dr. Perry found, after surgery to remove the heterotopic bone mass in 1998, that Plaintiff's prognosis was good, he was in good condition, and he had independent locomotion. (Tr. 341-346). Plaintiff later reported to Dr. Perry that he felt "very good" during therapy and experienced improvement in his condition for up to 1 hour after treatment, which Dr. Perry found was a definite improvement. (Id. at 373). Approximately 4 months after surgery, Dr. Perry wrote to Plaintiff's counsel that the physical therapy was providing "good relief" of his symptoms for up to 3 hours and that he should have "considerable relief of discomfort." (Id. at 379). Indeed, a physical therapy report in March 1999 indicated that Plaintiff had decreased pain and greater flexibility after treatment, even though temporary, and improvement of hip flexibility from 70 to 85 degrees and hip abduction from 30 to 35 degrees. (Id. at 390). It was further noted that he could perform his stretches and strengthening exercises on his own, at home, from that point forward. (Id.)

26

- <u>Dr. Russell</u> noted in May 1999, that Plaintiff's complaints of pain were less after surgery, as his pain was no longer level "10/10" but was "7/10," and in June 1999, he was found to be doing "fairly well." (<u>Id</u>. at 385-386). Plaintiff even reported to Dr. Russell that he had obtained a dispatcher job with the Sheriff's department and worked for a while, but then quit, not due to pain, but because he "did not like it." (Tr. 385).

- <u>Dr. Brown</u> noted in January 1999 that Plaintiff had only a minimal right leg limp and that his orthopedic problems may well improve further. (<u>Id</u>. at 361-367). Additionally, he noted, in a RFC assessment, that Plaintiff experienced only slight limitations of activities of daily living. (<u>Id</u>.)

- <u>Dr. Fontana</u> opined, in an RFC evaluation, that Plaintiff could sit/walk/stand for 1 hour each, sit for 8 hours per 8 hour day, stand for 6 hours per 8 hour day, walk for 4 hours per 8 hour day, lift up to 10 pounds continuously, lift up to 25 pounds frequently, lift up to 50 pounds occasionally, but never lift 51 pounds or more, and carry up to 5 pounds continuously, 20 pounds frequently, 25 pounds occasionally but never 26 pounds or more. (<u>Id</u>. at 359). Dr. Fontana noted further, that Plaintiff can use his hands and feet for repetitive movements, can occasionally bend, squat, crawl, climb and frequently reach, and only has total restrictions being around unprotected heights, moderate restrictions against being around moving machinery, and mild restrictions driving automotive equipment. (<u>Id</u>.) Dr. Fontana added that Plaintiff had 2+ deep tendon reflexes, normal sensory and motor function, good squatting, good toe to heel gait, straight leg raising test 90 degrees sitting and 45 degrees on right and left in supine position, mild hip pain, good range of hip motion and that even though there was a possibility for even further improvement, Plaintiff could perform light and sedentary type of work activities at that point in time. (<u>Id</u>.)

- <u>Dr. Crotwell</u>, in 2001, found no significant physical limitations/abnormalities and noted that some of Plaintiff's findings were inconsistent and that Plaintiff would fight him during the physical examination. He opined that Plaintiff had very

27

little orthopaedic problems and would be able to
carry out moderate, light and sedentary work. (Tr.
465-466).  Upon examination, he found that Plaintiff
had normal toe/heel walk, 2+ reflexes, normal
sensory exam, 5/5 motor strength, 50% flexion and
40% extension without tenderness/spasms, sitting
straight leg raising test at 90 degrees with no pain
at all and negative bilateral lying hip rotation.
(Id.)  Dr. Crotwell also noted that Plaintiff's
calves and thighs showed "tremendous quad and
musculature" which was very inconsistent with his
claim of having to use crutches.  (Id.)  Dr.
Crotwell also completed a physical capacities
evaluation for Plaintiff finding that he could
sit/stand/walk for 2 hours at one time;
sit/stand/walk for 8 hours per 8 hour day; lift up
to 50 pounds frequently, 25 pounds continuously and
up to 100 pounds occasionally; carry up to 25 pounds
frequently, 20 pounds continuously and up to 50
pounds occasionally but no more; frequently bend,
squat, crawl, climb and reach continuously; use both
hands and feet for repetitive movements. (Id.)

- Dr. Wallace found that there was no obvious or
  objective reason for Plaintiff's claims of
  persistent pain and opined that he could return to
  work, noting what he termed as Plaintiff's "drug
  seeking behavior." (Id. at 341, 357-358, 466, 470-
  491, 547, 685-687).  In January 2002, Dr. Wallace
  further noted that x-rays after Plaintiff's surgery
  showed "excellent" results and his range of motion
  was "quite good." (Id.)

Finally, Plaintiff's 2001 records from Mobile Infirmary reveal
that he had no difficulty walking, had full range of movement and
his x-rays were within normal limits.  (Tr. 527-546).  See also
supra.  In sum, the record fails to demonstrate any significant
physical findings after Plaintiff's surgery that would prevent him
from working.  To the contrary, the records reveal that Plaintiff's
condition responded to physical therapy and treatment, and that
within a few months after surgery, he exhibited good range of

28

motion, good toe/heel gait, 2+ deep tendon reflexes, etc.   <u>See</u>
<u>supra</u>.   In light of the substantial medical evidence, good cause
existed for the ALJ to decline to assign controlling weight to Dr.
Barnes' sedentary finding, as it was inconsistent with the objective
medical evidence of record, at a minimum, and conclusory, at best.
<u>See</u>, <u>e.g.</u>, <u>Lewis v. Apfel</u>, 2000 WL 207018 (S.D. Ala. Feb. 16, 2000).

**2.   <u>Whether the ALJ erred by finding that Plaintiff could
perform his past relevant work as a security guard when
VE testimony limited him to the performance of a
sit/stand option job</u>?**

Plaintiff argues that the ALJ erred by finding that he could
perform his PRW as a security guard in violation of SSR 82-62.
(Doc. 8 at 6-9).   Plaintiff asserts that the physical assessment
completed by Dr. Fontana limited him to sitting, walking and
standing for only 1 hour at a time, that the ALJ adopted Dr.
Fontana's assessment, and that the VEs testified that the
limitations imposed by Dr. Fontana amounted to a sit/stand
limitation which would prevent Plaintiff from returning to his
security guard position.   (<u>Id</u>. (citing to Tr. 30, 359)).   The
undersigned's review of the record reveals that the ALJ did not err
in concluding that Plaintiff could return to his past work as a
security guard.

An individual will be found "not disabled" at step four when
it is determined he retains the residual functional capacity ("RFC")
to perform the actual functional demands and job duties or a
particular past relevant job, or the functional demands and job

duties of the occupation as generally required by employers throughout the national economy. Social Security Ruling 82-62: *Titles II and XVI: A Disability Claimant's Capacity to Do Past Relevant Work, In General.* Plaintiff bears the burden of proving an inability to perform PRW (<u>i.e.</u>, that he cannot meet the physical and mental demands of same). <u>See</u>, <u>e.g.</u>, <u>Lucas v. Sullivan</u>, 918 F.2d 1567, 1571 (11th Cir. 1990); <u>Cannon v. Bowen</u>, 858 F.2d 1541, 1544 (11th Cir. 1988); <u>Jones v. Bowen</u>, 810 F.2d 1001, 1005 (11th Cir. 1986) (per curiam); <u>Jackson v. Bowen</u>, 801 F.2d 1291, 1293 (11th Cir. 1986). SSR 82-62 provides that evaluation under § 404.1520(e) "requires careful consideration of the interaction of the limiting effects of the person's impairment(s) and the physical and mental demands of . . . her PRW to determine whether the individual can still do that work." 20 C.F.R. §§ 404.1520a(e), 416.920a(e). <u>See also</u> <u>e.g</u>, <u>Lucas</u>, 918 F.2d at 1574 n. 3 (stating that to support a conclusion that a claimant "is able to return to her past work, the ALJ must consider all the duties of that work and evaluate her ability to perform them in spite of her impairments[]"). As noted <u>supra</u>, however, the plaintiff bears the burden of proving that he cannot meet the physical and mental demands of his past relevant work, either as he performed it in specific past employment or as the work is generally performed in the national economy. <u>Jackson</u>, 801 F.2d at 1293.

Nevertheless, the ALJ must develop a full and fair record concerning the issue, as in the absence of evidence of the physical or mental requirements and demands of the work, he could not properly determine that the plaintiff retained the residual functional capacity to perform it. See, e.g., Schnorr, 816 F.2d at 581; Nelms v. Bowen, 803 F.2d 1164, 1165 (11th Cir. 1986). Accord Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990). Indeed, the Commissioner's own instructions are even more specific:

> . . . . [a]ny case requiring consideration of PRW will contain enough information on past work to permit a decision as to the individual's ability to return to such past work . . . . Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations. Detailed information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate. This information will be derived from a detailed description of the work obtained from the claimant, employer, or other informed source . . . .

SSR 82-62, 1982 WL 31386, *3. Accordingly, the ALJ must determine the claimant's RFC[6] using all relevant medical and other evidence in the record. Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004). Thereafter, if the ALJ determines that the plaintiff has the RFC to meet the physical and mental demands of work performed in the

---

[6]The residual functional capacity is a measure of what a claimant can do despite limitations. 20 C.F.R. § 404.1545. It is the function of the ALJ to determine the Plaintiff's residual functional capacity through examination of the evidence and resolution of conflicts in the evidence. Wolfe v. Chater, 86 F.3d 1072, 1079 (11th Cir. 1996). The ALJ must base the assessment upon all of the relevant evidence of the Plaintiff's remaining ability to do work notwithstanding her impairments. Lewis 125 F.3d at 1440; 20 C.F.R. §§ 404.1546, 404.1527.

past, he is considered able to perform his PRW, and thus, is not disabled.  20 C.F.R. §§ 416.960, 404.1520.

In the case <u>sub judice</u>, substantial evidence supports the ALJ's decision that Plaintiff could return to his PRW as a security guard. As noted <u>supra</u>, Dr. Fontana, in his physical assessment dated January 26, 1999, found that Plaintiff could sit/stand/walk for a total of 1 hour at a time in an 8 hour workday, could sit a total of 8 hours during an entire 8 workday, could stand a total of 6 hours during an entire 8 workday, and could walk a total of 4 hours during an entire 8 workday.  (Tr. 359).  At both administrative hearings, the ALJ asked the VEs whether an individual with the same vocational profile as the claimant, and who possessed the RFC identified in Dr. Fontana's functional evaluation could work as a security guard.  (<u>Id</u>. at 68-70, 97-98, 101-102).  Both VEs opined that such an individual could work as a security guard.  (<u>Id</u>.) While VE Cowart noted that the findings in the first part of Dr. Fontana's evaluation and those in the second appear inconsistent,[7] he opined that if Plaintiff could sit for 8 hours, stand for 6 hours, and walk for 4 hours in an entire 8 hour workday, he could perform his PRW as a security guard.  (<u>Id</u>. at 68-69).  VE Cowart

---

[7] While at first blush the findings appear inconsistent, an overall reading of Dr. Fontana's evaluation reflects that the first section addressed the total sitting, walking and standing that Plaintiff could do at one time, while section two addressed the total amount of sitting, walking and standing that he could do during the course of an entire 8 hour workday.  Thus, the findings were not inconsistent, as they were meant to address two different time intervals.

further testified that if you focused only on the part of evaluation that indicated that Plaintiff could walk/sit/stand for 1 hour, then he could not perform the security guard position; however, he testified that "[t]here should be jobs that he could perform with a sit/stand option." (Id. at 69).

During the second administrative hearing, VE Murphy testified that with the physical limitations set out by Dr. Fontana, Plaintiff could perform his PRW as a security guard. (Id. at 97-98). VE Murphy also noted that if an individual could stand for 1 hour and walk for 1 hour, such would not require a sit/stand option for light work; however, if the individual could only be on his feet for 1 hour total, then a sit/stand option would be required and Plaintiff would not be able to perform the security guard position. (Tr. 101-102). VE Murphy further testified, however, that if Plaintiff could not return to his PRW, there are other jobs, both sedentary and light, which he could perform. (Id. at 98-99).

In view of the above evidence, the undersigned finds that the ALJ did not err in concluding that Plaintiff could return to the security guard position. The position is classified as light, and requires the ability to walk/stand for 6 hours in an 8 hour work day, to lift no more than 20 pounds at a time, and to frequently lift and carry objects weighing only up to 10 pounds. 20 C.F.R. § 404.1567; SSR 83-10, 1983 WL 31251 (S.S.A). The physical limitations contained in Dr. Fontana's evaluation, including his

finding that during an entire 8 hour day, Plaintiff could sit for 8 hours, stand for 6 hours, and walk for 4 hours, clearly come within the parameters of the security guard position.  Accordingly, because Plaintiff's PRW as a security guard did not require the performance of work activities precluded by his impairments, the ALJ's finding that he is able to return to his PRW is supported by substantial evidence and free of legal error.

3.   **Whether the ALJ erred by failing to develop a full and fair record regarding the vocational opportunities available to Plaintiff, in violation of SSR 00-4p?**

Plaintiff argues that the ALJ violated SSR 00-4p because he failed to develop a full and fair record with regard to the vocational opportunities available to him by failing to ask the VE whether the evidence conflicted with the Dictionary of Occupational Titles ("DOT") and obtain a reasonable explanation for any apparent conflict.  (Doc. 8 at 9-11).  Plaintiff claims that the ALJ did not ask the VE whether his testimony was consistent with DOT job descriptions; that the VE did not cite any DOT job description numbers during his testimony; and that the ALJ did not cite any DOT job description numbers in his description.  (Id. at 11).

The undersigned finds that Plaintiff's argument lacks merit. At the outset, the undersigned notes that this case was decided at step four of the sequential evaluation process; thus, while the ALJ may have questioned the VEs concerning other jobs which Plaintiff could perform, he was not required to do so once he determined that

34

Plaintiff could return to his PRW.  See, e.g., Lewis, 2000 WL 207018, *11.

VE Murphy testified that Plaintiff's PRW consisted of security guard (light, semi-skilled), janitor (medium, unskilled), substitute bus driver (medium, semi-skilled) and laborer (heavy, unskilled), and that based upon Dr. Fontana's evaluation, he could perform the demands of the security guard position. (Tr. at 96-105).  In his decision, the ALJ stated that pursuant to SSR 00-4p, he examined VE Murphy's testimony of the nature of the claimant's PRW against the DOT description, and found that there was no conflict between the DOT description and the VE's testimony regarding Plaintiff's PRW. (Id. at 29).  Additionally, while Plaintiff contends that the ALJ erred in not asking the VE about any conflict, he has not identified any conflict to the Court, nor has the Court uncovered any such conflict.  SSR 00-4p provides, in pertinent part, that:

> [o]ccupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT.  **When there is an apparent unresolved conflict** between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p, 2000 WL 1898704, *2 (S.S.A.) (emphasis added).  Because the record is totally devoid of any evidence that suggests a possible conflict between the VE's testimony and the occupational

information supplied by the DOT, SSR 00-4p was simply not triggered, and can accordingly provide no ground for error in this case. <u>See</u>, <u>e.g.</u>, <u>Jackson v. Barnhart</u>, 120 Fed. Appx. 904, 905-906 (3rd Cir. 2005) (unpublished).

## V.   <u>Conclusion</u>

For the reasons set forth, and upon careful consideration of the administrative record and memoranda of the parties, it is recommended that the decision of the Commissioner of Social Security, denying Plaintiff's claim for disability insurance benefits and supplemental security income benefits, be **AFFIRMED.**

The attached sheet contains important information regarding objections to this <u>report and recommendation</u>.

DONE this **31st** day of **March, 2006.**

        **/s/ SONJA F. BIVINS**
        **UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.   **Objection**.   Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a de novo determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.   See 28 U.S.C. § 636(b)(1)(c); and Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).   The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.   The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.   The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.   It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.   Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **Opposing party's response to the objection.**   Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection. See Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.   Any party planning to object to

this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

                                      _____/s/ SONJA F. BIVINS_____
                                        **UNITED STATES MAGISTRATE JUDGE**